IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ANGELIA GILLILAND                    )
                                     )
              Plaintiff              )
                                     )
        vs.                          )        CASE NO. CV98-HGD-1874-S
                                     )
JEFFERSON COUNTY BOARD OF            )
EDUCATION, et al.,                   )
              Defendants             )

**ENTERED**
FEB 2 1 2001

## <u>MEMORANDUM OPINION</u>

This matter is before the undersigned United States Magistrate Judge based on the

consent of all parties in accordance with the provisions of 28 U.S.C. § 636(c) and Rule 73,

Fed.R.Civ.P. The Court has taken under submission the evidence and arguments of the parties

with regard to the motions for summary judgment filed on behalf of the Jefferson County Board

of Education [Doc. #89] and defendants James Jett, Richard Moon, and Gene Ramsey [Doc.

#90].

This is a sexual harassment/discrimination suit arising out of the alleged acts of band

teacher, defendant Gene Ramsey (Ramsey), at Warrior High School. Plaintiff, Angelia Gilliland,

also has brought claims against the Jefferson County Board of Education (Board); the individual

members of the Board, acting in their official capacities; James Jett, former principal of Warrior

High School (Jett); Richard Moon, former assistant principal of Warrior High School (Moon); and

Ramsey under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 (Title IX),

42 U.S.C. § 1983, and Alabama tort law.  The parties to each count of the complaint are as follows:  Count I (Title IX):  Jefferson County Board of Education;  Count II (§ 1983):  Jefferson County Board of Education; and Jett, Moon, and Ramsey in individual capacities;  Count III (state law-invasion of privacy):  Ramsey, individually;  Count IV (state law-assault and battery):  Ramsey, individually;  Count VI (state law-outrage):  Ramsey, Jett and Moon, individually; and Count VII (state law-negligent retention):  Board members in official capacities (injunctive relief only).

**FACTUAL BACKGROUND**

When considering a motion for summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party.  In this instance, the non-moving party is the plaintiff, Angelia Gilliland, and the facts are viewed accordingly.

Warrior High School is one of several schools under the control of the Jefferson County Board of Education.  At the time of the events alleged in the complaint, the principal of Warrior High School was James Jett.  The assistant principal was Richard Moon.  The principal is responsible for the day-to-day operation of the school, including care of students, academic matters, class scheduling and placement, and handling disciplinary matters involving both students and faculty.  However, the ability to discipline a faculty member is limited to oral and written reprimands; any more severe discipline is performed by the Board.  Likewise, the principal makes recommendations regarding the hiring and retention of faculty members to the

2

superintendent, but final decision-making authority in this matter is vested solely in the Board. The assistant principal assists the principal in carrying out these duties.

Dr. Bruce Wright was the Superintendent for the Board during the time period alleged in the complaint. It was his duty to oversee the operation of the school system. Day-to-day contact with the staff of the various schools under his supervision generally was handled by area superintendents. From 1994 until July 1997, the area superintendent for Warrior High School was Dr. Jerry Mitchell. In July 1997, Dr. Anna Vacca replaced Mitchell as the area superintendent for Warrior High. An area superintendent is charged with the oversight of a group of schools in the Jefferson County system on behalf of the Board Superintendent. [Bruce Wright Depo.]

Angelia Gilliland was a student at Warrior High School from August 1994 to June 1998. Gilliland was a minor during the events set forth in this case. She first met Ramsey in the summer of 1994 when she inquired about joining the Warrior High band. She subsequently joined the band during her freshman year, 1994-95. Gilliland alleges that after she joined the band, Ramsey began to talk to her and ask her and other female students questions about matters that were sexual in nature. He also began to rub and caress her and other female students, including shoulder massages that involved touching the tops of her breasts and grabbing her bottom. Gilliland initially was not bothered by these incidents, but as they continued, she got tired of it and eventually began to make complaints about it.

The first incident that Gilliland reported occurred in 1994. At that time, she was dating a boy named Ben. On a bus going to a football game, Ramsey sat by Gilliland and told her that

3

Ben was cheating on her with a girl named Sandy. He also asked Gilliland if she and Ben had ever had sexual relations. [Angelia Gilliland Depo. at 299]. On another occasion while in the ninth grade, plaintiff states that, while she and several other students were in Ramsey's office, one student began talking about watching the Playboy channel and seeing a boy and girl engage in sexual relations using whipped cream. Ramsey responded that he did that "all the time." [Id. at 313]. Plaintiff did not feel that she was being sexually harassed at this time. [Id. at 315]. Also during her ninth grade year, Gilliland and other female students were in the "uniform room" in the school trying on band uniform pants. Ramsey kept knocking on the door and saying he was going to come in. However, he never did so. [Id. at 323]. She also took this incident as a joke. [Id. at 325].

Gilliland states that during this same time, Ramsey would refer to her and another student, Mandy (Childers), as his "girl friends." [Id. at 326]. Plaintiff states that, while in the ninth and tenth grades, Ramsey would put his hand over her mouth or Mandy's mouth and act like he was kissing them. This happened to Gilliland on five or six occasions during those two years. [Id. at 406-08]. On one occasion during concert season of her ninth-grade year, plaintiff was standing in the drum line playing cymbals when Ramsey stated that moving her arms in that manner would "make [her] boobs grow" but that she did not need for them to grow because they were already big enough. [Id. at 343].

Gilliland states that she was in the band room on another occasion when Ramsey walked behind her and grabbed her bottom. When this occurred, she was startled and thought it inappropriate, but she said nothing to Ramsey at that time. [Id. at 418-19]. She did not report

4

the incident to school officials and did not tell her mother until much later. [*Id.* at 421, 424]. According to Gilliland, Ramsey repeated this type of action on several other occasions. [*Id.* at 444].

While plaintiff was in the tenth grade, similar incidents continued. Gilliland states that she was sitting in the back of a bus going to a football game along with three other female students when Ramsey came back to where they were sitting and asked them what they thought "cum" (semen) tasted like. Gilliland made no response to this inquiry. [*Id.* at 329-30]. The following day, Ramsey called Gilliland's mother and asked her if Gilliland had told her about the incident on the bus. When she said no and asked what he was talking about, he told her that it was nothing and that the girls had just been talking "girl talk." Subsequently, Gilliland's mother asked plaintiff about the incident, and plaintiff told her what Ramsey had said to her. [*Id.* at 333]. She also reported the "boobs" remark and reported that Ramsey and another female student, Sharon (Campbell), spent a lot of "quality time" together during this time period. [*Id.* at 353; *see also id.* at 325-26].

Gilliland states that at the Halloween carnival at the school that year, she overheard her mother begin to talk to principal James Jett about the inappropriate way in which Ramsey spoke to the female students. Gilliland then walked away from them. [*Id.* at 478-79]. She does not remember personally providing Jett with any information concerning Ramsey's behavior. [*Id.* at 612].

In October of her tenth-grade year, Gilliland was on a band bus going to a football game on an occasion when another student had brought alcohol onto the bus. She states that Ramsey

5

"custom or policy . . . result[s] in deliberate indifference to constitutional rights."  *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991) (citation omitted).

Here, neither Jett nor Moon participated in the alleged sexual harassment of Gilliland. However, there is evidence of prior inappropriate acts by Ramsey which, if believed, should have put Jett and Moon on notice that Ramsey might commit or was committing such abuse. This evidence includes their awareness of the notes written by Ramsey to Crystal Lauminick; the 1995 event when Ramsey and a female traveled alone to a band competition in Montgomery and concerning which he was advised to avoid being alone with female students in the future; the 1996 incident involving Ramsey leaving class unattended so that he could take a female student to get her driver's license and concerning which he was reprimanded and reminded of the previous warning about not being alone with female students; a 1995 rumor that Ramsey was having sexual relations with a sixteen-year-old student; requests by both Angelia Gilliland and her mother that Angelia be removed from Ramsey's classes because he was sexually harassing her; a letter from parent Janice Long in April 1997 that a female student disrobed down to her panties in front of Ramsey, that a female student also unbuttoned her blouse in front of Ramsey, and that he watched without taking any action in either instance to reprimand the student; the allegation that Ramsey had asked several female students if they knew what "cum" tastes like; and Sheila Gilliland's claim that Ramsey told her that if he were not already married, he would be after her daughter.

Under these circumstances, the Court concludes that there is sufficient evidence, if believed, for a jury to find that Ramsey was involved in widespread abuse of such obvious,

knew of this but did nothing about it. She and several other students drank the alcohol and also took some caffeine pills. Plaintiff and a friend named Mandy became sick. Gilliland states that when this occurred, Ramsey came and sat next to her, put her head in his lap, and began rubbing her head, back and legs. He also put her hand on his leg and began moving it towards his crotch. When he did this, Gilliland moved her hand. [*Id.* at 361-62]. At one point, he also put his head on her shoulder and began to rub her upper thigh. Gilliland was wearing shorts at this time, and Ramsey's actions made her feel uncomfortable, and she thought it inappropriate. She did not say anything to Ramsey but crossed her legs. When she did this he moved his hand and, shortly thereafter, moved and sat by another student. [*Id.* at 363-66, 372-73, 426].

Gilliland made no immediate report of any of these incidents to school faculty or staff. However, toward the end of her tenth-grade year, she was speaking to the school guidance counselor, Stephanie Alexander, when Alexander told her that she had heard some things about Ramsey talking dirty to other females and asked her if she knew anything about it. At this time, plaintiff told Alexander about the incidents involving Ramsey placing his hand over her mouth and pretending to kiss her. [*Id.* at 412-14].

Gilliland states that Ramsey also engaged in conversations with her and Mandy about which one of them was better in bed sexually. On one such occasion, he stated that if she and Mandy would come spend the night with him, he would just "lock his wife in the dog house." [*Id.* at 417]. Gilliland considered these remarks to be inappropriate but never said so to Ramsey. [*Id.* at 418]. On another occasion while in the tenth grade, Gilliland was dating a boy

6

named Sheldon (Sullivan) and often drove his truck to school.  According to plaintiff, Ramsey

asked her if she was having sex with Sheldon so that she could drive his truck.  [*Id.* at 435-36].

She did not report this to school officials or any family members at that time.  [*Id.* at 438].

Gilliland also states that there were several occasions while she was in the tenth grade

that she and other students would be in the band room when Ramsey would call 1-800

numbers which would play the voice of a sexy woman using obscene words and talking about

phone sex.  Ramsey would put these calls on a speaker phone so everyone in the room could

hear.  [*Id.* at 447-49].  She did not immediately report these calls to school officials.  [*Id.* at 453].

Gilliland states that during that same school year, Ramsey wrote a poem to her which

she states Ramsey described as a "love letter."  She did not report it to school officials.  [*Id.* at

481-85].  This poem reads:

> Angelia,
> Though the moments we spend together are few[,] each and every
> time is a memory I will cherish forever.
> Please do not ever let the sun go down without thinking about us
> and our "forever."
> Think of me fondly.
>
> Yours Forever,
> ?

[Doc. #103, Exh. 15].

Gilliland reports that from the ninth until the eleventh grade, she and other band

members would hang out at Ramsey's office and that, on ten to fifteen occasions, he pulled her

into his lap and massaged her shoulders and back and sometimes went down to the tops of her

breasts.  When this occurred, she would move.  [*Id.* at 461].  She eventually quit sitting in his

lap to avoid the problem. [*Id.* at 462]. He also did this to other female students. [*Id.* at 455-57]. She made no immediate report of this to school officials. [*Id.* at 457].

Gilliland avers that on another occasion when she was in either the tenth or eleventh grade, Ramsey told her that he bet she was better in bed sexually than his wife. Plaintiff did not report this to school officials at that time but later reported it to the guidance counselor, Ms. Alexander. [*Id.* at 491-92]. During this same time period, Ramsey came to the ballpark on several occasions when Gilliland was having softball practice and told her and another female student that they looked "real sexy" in their softball pants. [*Id.* at 493].

Just before the beginning of her eleventh-grade year, plaintiff was at the school in order to try on a color guard/majorette uniform. She was among the last to leave. While there, Ramsey made a remark about how she looked in her majorette outfit and kept asking her to stay with him. She refused. According to Gilliland, Ramsey begged her to stay, saying he needed to talk to her. This made her uncomfortable, so she told Ramsey she would call him when she got home. When she got home, she called him but he then told her he did not have anything to say to her. This made her scared of him. [*Id.* at 474-75]. Later, during football season, Ramsey told Gilliland that she was sexier in her uniform than any of the other girls. [*Id.* at 511-12].

Also in the eleventh grade, plaintiff was present with her mother at the school when Ramsey told her mother that if he was not already married, he would be after plaintiff. [*Id.* at 464]. Plaintiff's mother corroborated this incident. [Sheila Gilliland Depo. at 31]. On another occasion, when plaintiff was in the eleventh grade, Ramsey asked her if she and Sheldon were

8

still having sex. [Angelia Gilliland Depo. at 439]. Gilliland states that by the eleventh grade she was getting tired of Ramsey's behavior. She did not say anything to Ramsey but, instead, tried to get out of his class. [*Id.* at 440]. At that time, she had Ramsey for band and a test-taking skills class.

In approximately January of her eleventh-grade year, Gilliland again went to the guidance counselor, Stephanie Alexander. She states that she told Alexander how Ramsey treated her and other female students; about "touching" incidents, including his touching her bottom on several occasions; about Ramsey talking dirty to female students; about pulling her into his lap; about telling her mother that, if he were not married, he would be after plaintiff; about asking whether she or Mandy was better in bed; and about his making phone calls to sex-talk lines and putting it on the speaker phone so all the students could hear. [*Id.* at 444-46]. She also told Alexander that Ramsey would call her at home when she missed school asking why she was not there and telling her he missed her. [*Id.* at 523-24] Gilliland advised Alexander that she thought that Ramsey was a pervert and that she wanted out of his class. [*Id.* at 440].

Plaintiff states that Alexander told her she would have to get the permission of assistant principal Richard Moon to leave Ramsey's class. Plaintiff met with Moon and told him she wanted out of Ramsey's class because she though he was perverted. She states that she gave him specific examples of what she meant by perverted, though she could not recall which of the incidents she related to him. [*Id.* at 539-40]. According to Gilliland, Moon would not let her leave the class. Her mother also spoke to Moon and Alexander to get plaintiff moved, but

9

Moon would not let her move out of the class. [Id. at 539]. Within a couple of days or weeks, Gilliland states she again met with Moon and again told him why she wanted out of Ramsey's class. [Id. at 544-45]. Nevertheless, he did not allow her to leave these classes.

After she was unable to get out of Ramsey's classes, Gilliland states she began skipping them. [Id. at 596]. She states that she developed an "attitude" toward Ramsey and hated being in his classes. Eventually, she made a deal with Ramsey where he agreed that, if she came to class two days a week, he would pass her. [Id. at 527]. Nevertheless, he flunked her. [Id.] The preceding semester she had made an A. She claims that numerous other students also missed numerous classes and were not flunked and names several of them. [Id. at 529].

In the twelfth grade, plaintiff left the band and became a cheerleader. Her brother, David, was still in the band. On one occasion, when David was not in school, Ramsey stopped plaintiff in the hall and asked her where David was. He then asked her if she and Sheldon were still having sex. [Id. at 468-69]. Plaintiff was perturbed and angered by this question and responded only that her brother was sick and then walked off. [Id. at 469-70]. She never reported this to a school official. [Id. at 471].

Plaintiff states that on another occasion during her twelfth-grade year, Ramsey came up to her in the lunchroom on the next school day following a football game and began talking to her. She states she told him that the band had sounded good the previous night, and he replied that he had not paid much attention to it because he was too busy staring at her jumping around in her short skirt. She did not report this to school officials. [Id. at 488-89].

10

Sheila Gilliland, plaintiff's mother, states that she spoke with James Jett at the school Halloween carnival on October 31, 1996, and reported Ramsey's comment to the female students on the bus about what "cum" tastes like. She also told him about Ramsey's comment that, if he were not married, he would be after her daughter. She asserts that she told him that this conduct was unprofessional, sexual harassment and that she wanted it stopped. [Sheila Gilliland Depo. at 36, 38-39]. Jett advised her that he was aware of Ramsey's comment made on the bus. [Id. at 39].

In the second semester of her junior year in high school, plaintiff told her mother she wanted to be taken out of her classes with Ramsey. When asked why, her daughter reported that it was because she was being sexually harassed by Ramsey. [Id. at 61]. When she asked her daughter for details, Angelia told her about Ramsey massaging her shoulders and touching her breasts. She was told that Ramsey could not keep his hands off her bottom and made comments to her about having sex. [Id. at 62].

Upon learning of this, Sheila Gilliland called the school guidance counselor, Stephanie Alexander, and told her, without giving any specifics, that she wanted her daughter out of Ramsey's class because he was sexually harassing her. This occurred during approximately the first week of January 1997. [Id. at 63-65]. Alexander told her that this would require the approval of Mr. Moon. [Id. at 65].

According to Sheila Gilliland, she next called Mr. Moon and told him she wanted her daughter out of Ramsey's class because he was sexually harassing her. She states that she told Moon about Ramsey's comment to her about going after her daughter if he was not already

11

married, that Angelia and Ramsey did not get along, and that she did not want her daughter to be ineligible for sports which would occur if she got a bad grade in the two subjects she had under Ramsey. [*Id.* at 68-69]. Moon told her that it was too late in the class year to take Angelia out of these classes, and he thought it was in her best interests for her to remain in them. [*Id.* at 69]. This is the last conversation Mrs. Gilliland had with Moon about this event, and she never talked to any other school officials about it. [*Id.* at 69-70].

In March of 1997, the Warrior High School Band Boosters group wrote a letter to Superintendent Bruce Wright complaining about Ramsey's lack of professionalism and the manner in which Ramsey was handling the band and band finances, but no mention was made of the alleged incidents of sexual harassment by Ramsey. [*Id.* at 82-83]. The Boosters subsequently received a letter from Wright stating that he had addressed their concerns with Jett who, in turn, had talked to Ramsey. This letter made Sheila Gilliland believe things would get better. [*Id.* at 112]. However, the harassment continued. [*Id.* at 102]. Angelia reported to her mother that Ramsey would stare up and down at her body, inquired about her sex life, asked if she was having sex with her boyfriend, and flunked her in both test-taking and band classes. [*Id.* at 103-05].

Sheila Gilliland did not discuss any of these alleged incidents of sexual harassment with any school official, except Moon, as outlined above, until she and others met with area director, Dr. Anna Vacca, in the fall of 1997. [*Id.* at 133]. Shortly after the meeting with Vacca, the school board commenced an investigation. [*Id.* at 140-41]. Ramsey was placed on administrative leave and subsequently resigned.

12

Several other students also reported incidents of a sexual nature involving Ramsey. Crystal Lauminick testified that, while she was in the eighth grade in 1994, her mother removed her from the band because of some letters written to her by Ramsey which were personal in nature. At least two of the letters contained graphic sexual references. Two others of a personal but less graphic nature were discovered by Lauminick's mother. Nevertheless, the letters were of such a nature that she complained to Richard Moon. [Doc. #103, Exh. 26]. Moon confronted Ramsey who admitted writing the two notes discovered by Lauminick's mother. Moon wrote a letter of reprimand to Ramsey but described the notes as "simple notes" with no indication of any intention other than greetings. He advised Ramsey that such activity was unprofessional and admonished him to never write personal notes to students. [Doc. #103, Exh. 2]. A copy of this letter was sent to Jett and area supervisor Mitchell and placed in Ramsey's personnel file. Moon never spoke personally with Crystal Lauminick nor did any further investigation.

James Jett also spoke with Ramsey in 1995 concerning his failure to use good judgment when he traveled alone with a female student to a band competition in Montgomery, Alabama. Although Ramsey had permission from the student's parent to do this, Jett did not consider it to be a good idea. No written reprimand resulted from this incident.

Later, in November 1995, Jett and Moon received word of a rumor that Ramsey was having sex with a sixteen-year-old student. Jett and Moon met with Ramsey and told him about the rumor. He was advised that he needed to be careful not to put himself in a position that would lead others to think he was doing something wrong. [Doc. #103, Exh. 4]. However, no

13

further investigation was performed by either Jett or Moon to determine if there was any truth to the rumor.

In August 1996, Ramsey again was reprimanded by Jett and Moon for leaving his class unattended to take a female student to get her driver's license. A copy of the letter of reprimand was sent to area supervisor Mitchell. [Doc. #103, Exh. 6]. This was followed up with another letter of reprimand to Ramsey from Mitchell. [Doc. #103, Exh. 7].

On April 7, 1997, Warrior High School Band Boosters secretary Janice Long wrote a letter to Jett complaining about numerous problems with the band. In that letter she advised Jett that she observed a female student pull her pants off, down to her panties, in front of Ramsey who merely watched but said and did nothing. On another occasion this same student unbuttoned her blouse in front of Ramsey. [Id.]. Other parents also complained to Jett and Moon about these incidents, but nothing was done until these matters were brought to the attention of area supervisor Vacca in the fall of 1997. [Doc. #103, Exh. 20, Exh. 21].

Gene Ramsey denies that he committed any of the acts alleged by Angelia Gilliland and other female students, except those incidents documented in letters or memos from Jett, Moon or Mitchell. [See generally Ramsey Depo.].

James Jett denies that he was ever made aware of or had any discussion with anyone regarding the incident where it is alleged that Ramsey asked several female students, including plaintiff, if they knew what "cum" tasted like. [Jett Depo. at 86]. He also denies having had any conversation with Sheila Gilliland about Ramsey saying Ramsey would be after Angelia if he was not already married. [Id. at 184]. He also states that he never heard that Ramsey had allegedly

14

made comments of a sexual nature to female students, touched female body parts or inquired about a student's sex life. [*Id.* at 123].

However, Jett admits that he received the letter from Janice Long dated April 7, 1997, [Doc. #103, Exh. 7], wherein he was advised that a female student had been observed taking her pants off, down to her panties, in front of Ramsey, who did nothing. [Jett Depo. at 107]. Jett does not recall having spoken with anyone about this incident or investigating the allegations. [*Id.* at 112-13].

Jett also acknowledges that, aside from talking to Ramsey, he did not investigate any of the allegations that he was aware of involving Ramsey, including the incident involving the letters to Crystal Lauminick, the rumor that Ramsey had sexual relations with a sixteen-year-old student, or the incident when Ramsey left his class unattended in order to take a female student to get her driver's license. [*Id.* at 153-55]. He acknowledges that he cautioned Ramsey on several occasions about being alone with female students. [*Id.* at 84]. He states that he spoke with Ramsey about the rumor that he was having sex with a sixteen-year-old student but does not know the source of the rumor. [*Id.* at 40, 70].

According to Jett, Moon informed him that Angelia Gilliland wanted to get out of Ramsey's class "for no apparent reason." [Jett Depo. at 178-79]. Jett asserts that he never spoke with Angelia Gilliland about her desire to be removed from Ramsey's class. [*Id.* at 180].

Richard Moon states that he also never was made aware of the allegation that Ramsey had asked female students about what "cum" tastes like. [Moon Depo. at 45-46]. He states that he never heard nor was he ever made aware that Ramsey allegedly made comments of a

15

sexual nature to female students, wrote notes to students of a sexual nature, grabbed female body parts, or inquired about female students' sex lives. [*Id*. at 42-43].

Moon recalls having a discussion with school guidance counselor Stephanie Alexander about Angelia Gilliland. He does not recall the substance of that conversation, except that Angelia was going to come to see him about getting out of Ramsey's classes. [*Id*. at 68-69]. Moon met with plaintiff who told him that she wanted to get out of Ramsey's classes. However, he states that she never told him why she wanted out [*Id*. at 70-71], and he does not recall ever looking into the possible reasons. [*Id*. at 77]. Moon told Angelia that she could not be moved out of the classes.

Moon also acknowledges that Angelia's mother, Sheila Gilliland, asked him to move Angelia out of Ramsey's classes. According to Moon, Sheila Gilliland gave him no reason for wanting Angelia moved and he did not ask for any. [*Id*. at 80]. He told her that Angelia could not be moved. [*Id*. at 84].

Moon was aware that complaints had been made about Ramsey for writing personal notes to an eighth grade female student, Crystal Lauminick, and he participated in a meeting with Ramsey and Jett about the matter, later preparing a letter of reprimand. Although a letter concerning the allegation that Ramsey left his class unattended in order to take a female student to get her driver's license and referencing another instance when he was alone with a female student reflect that Moon was present when they were discussed with Ramsey, he does not recall these meetings. [*Id*. at 33-35]. He also was aware that there was a rumor that Ramsey was having sex with a sixteen-year-old student, [*Id*. at 35], and that several students in his band

16

had gotten in trouble for drinking alcohol on a bus. [*Id.* at 65]. Aside from talking with and, in some instances, reprimanding Ramsey for these activities, Moon did no further investigation. [*Id.* at 63-64].

Dr. Jerry Mitchell was the area supervisor for Warrior High School until July 1997 when he was replaced by Dr. Anna Vacca. Dr. Mitchell states that the only incidents concerning Gene Ramsey of which he was aware involved the incident when Ramsey left his class unattended to take a female student to get her driver's license and the other incident, when he drove with a female student unaccompanied to a band competition, referenced in the letter written by Jett to Ramsey concerning the driver's license incident. [Mitchell Depo. at 58-61]. Though he has no recollection of being informed of the incident, Mitchell acknowledged that his file for Warrior High School contained the memo from Moon to Ramsey concerning the notes Ramsey wrote to Crystal Lauminick in 1994. [*Id.* at 80-81]. He was not aware of the other incidents, including the rumor that Ramsey was having sex with a sixteen-year-old student. He states that this incident (and others) should have been investigated further. [*Id.* at 85-86].

The Jefferson County Board of Education had a policy in place during the period in question prohibiting sexual harassment of students or employees and requiring that any report of harassment be forwarded to the teacher, assistant principal or principal's supervisor for investigation. A written response to a complaint is required within thirty days of the complaint. [Doc. #103, Exh. 16].

17

**DISCUSSION**

**Title IX Claim**

Title IX provides, in pertinent part, that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). The Supreme Court has recognized an implied private cause of action for money damages in Title IX cases of intentional sexual discrimination. *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 75, 112 S.Ct. 1028, 1038, 117 L.Ed.2d 208 (1992). Moreover, the Court has held that sexual harassment of a student by a teacher constitutes actionable discrimination for the purposes of Title IX. *Id*.

In *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998), the Supreme Court clarified the standard to be applied in determining school district liability under Title IX for a teacher's sexual harassment of a student. The Court held that:

> . . . a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has _actual_ knowledge of discrimination in the recipient's program and fails adequately to respond. (Emphasis added).

*Id.* at 299, 118 S.Ct. at 1999. Moreover, the Court decided that "the response must amount to deliberate indifference to discrimination" for liability to attach. *Id.* The Court pointed out the contractual nature of Title IX and rejected school district liability based on either *respondeat superior* or constructive notice. *Id.* at 298, 118 S.Ct. at 1997.

18

Thus, the determination of whether liability under Title IX attaches to the Jefferson County School Board in this case turns on whether there is evidence that any official with authority to address the discrimination and institute corrective measures had actual knowledge of the sexually hostile environment allegedly created by Gene Ramsey and visited upon Angelia Gilliland and others.

There is no evidence that the Jefferson County School Superintendent or any individual member of the Jefferson County Board of Education had any notice of Ramsey's alleged misconduct. The "rumor" that Ramsey was having a sexual relationship with a sixteen-year-old student is insufficient to provide the Board with actual notice. The only testimony possibly imputing actual knowledge of this incident to the Board is the deposition testimony of Ramsey wherein he states that when Jett and Moon spoke to him about the rumor, Jett told him that the information came from "the Board." This is hearsay within hearsay and inadmissible to prove the truth of the matter asserted therein, and neither Jett nor Moon could recall the source of this information. Therefore, there is no competent, admissible evidence that the Board was on notice of Ramsey's allegedly discriminatory conduct.

The next person in the chain of command is the area supervisor who, for most of the pertinent time period, was Dr. Mitchell. Dr. Mitchell has testified that the only incidents concerning Gene Ramsey of which he was aware were the 1996 incident when Ramsey left his class unattended to take a female student to get her driver's license and another incident that occurred in 1995, when he drove with a female student unaccompanied to a band competition. He only obtained knowledge of the 1995 incident in 1996 when it was referenced in the letter

19

written by Jett to Ramsey concerning the driver's license incident.  In addition, though he has no recollection of being informed of the incident, Mitchell acknowledged that his file for Warrior High School contained the memo from Moon to Ramsey concerning the notes Ramsey wrote to Crystal Lauminick in 1994.

These items are insufficient to put Mitchell on notice that Ramsey was engaged in inappropriate conduct of a sexual nature with female students at the high school.  The memorandum concerning the 1994 incident involving Lauminick referred to the letters as "simple notes" with "no indication of intention other than greetings."  There is no indication in the memorandum forwarded to Mitchell that the incident involved improper sexually-related conduct.  The 1995 incident involved a situation where Ramsey gave a female student a ride to a band competition.  Although he did so alone, it was done with the student's parents' permission, and there was no claim that Ramsey did anything improper while with the student.  Likewise, the 1996 incident also reflects no more than bad judgment by Ramsey.  In that incident, Ramsey failed to show up at a band class he had scheduled during a teacher work day because he took a female student to get her driver's license.  Again, there was no allegation that Ramsey had engaged or attempted to engage in any improper sexually-related conduct with the student.

There also is no evidence that Mitchell received any other information concerning any of the other incidents of which Jett and Moon were aware.  The Court in *Gebser* requires that the official have *actual* knowledge of harassment.  Constructive knowledge, such as might be inferred by evidence showing  that Jett might have forwarded other memoranda to Mitchell, is

20

insufficient as a matter of law.  Therefore, assuming *arguendo* that Mitchell was an official with some authority to act to remedy the alleged discriminatory conduct, there is insufficient evidence to reflect actual knowledge on his part.  See *Floyd v. Waiters,* 171 F.3d 1264 (11th Cir. 1999).

There is, however, considerable evidence that both Jett and Moon had actual knowledge that Ramsey was engaging in sexual harassment and promoting a sexually hostile environment at the school and school-related events.  Moon, Jett or both admit awareness of these events: (1) the notes written by Ramsey to Crystal Lauminick (Moon and Jett); (2) the 1995 event when Ramsey and a female student traveled alone to a band competition in Montgomery, Alabama (Moon and Jett); (3) the 1996 incident involving Ramsey leaving his class unattended so that he could take a female student to get her driver's license (Moon and Jett); (4) a rumor in 1995 that Ramsey was having sexual relations with a sixteen-year-old student (Moon and Jett); (5) a request by Angelia Gilliland to the guidance counselor to be removed from Ramsey's class (Moon); (6) a request to Moon from Angelia Gilliland that she be removed from Ramsey's class "for no apparent reason"(Moon and Jett); (7) a request by Angelia Gilliland's mother, Sheila Gilliland, that Angelia be removed from Ramsey's class (Moon); (8) a letter sent by Janice Long to Jett in April 1997 advising him that a female student had undressed down to her panties in front of Ramsey, who did nothing to stop or admonish the student (Jett); (9) a description in the same letter of an event where a female student unbuttoned her blouse in front of Ramsey (Jett); and (10) several instances when Ramsey was counseled against being alone with female students (Moon and Jett).

21

In addition, it is alleged, though disputed by Moon and Jett, that (1) Jett was advised at a school Halloween carnival by Sheila Gilliland of Ramsey's alleged statements to several female students if they knew what "cum" tastes like, and telling Sheila Gilliland that if he were not married, he would be after her daughter; (2) Angelia Gilliland requested Moon to allow her to be removed from Ramsey's class on two separate occasions wherein she advised Moon that she was being sexually harassed and gave him examples of the harassment; and (3) Sheila Gilliland also requested Moon to allow Angelia be removed from the class because of sexual harassment by Ramsey.

Likewise, there is ample evidence, if believed, that Jett and Moon failed to take reasonable corrective action amounting to deliberate indifference to the situation. Both Moon and Jett admit that they never interviewed any students nor did any investigation into any of the incidents outlined above. This is especially troubling in view of the letter by Janice Long which Jett admits to receiving and after which he undertook no action or investigation. In addition, this occurred during the same general time period that Angelia Gilliland was requesting to be removed from Ramsey's class, a move that was not allowed even though Jett admits that Moon told him that Gilliland wanted out of Ramsey's class.

School board liability thus depends upon whether either Jett or Moon are (1) officials of the school board, (2) who possess the authority to address the alleged discrimination and institute corrective action. The Court in *Gebser* stressed that for there to be school board liability, some "appropriate person" in the school district must have actual notice of the misconduct. 524 U.S. at 289-90, 118 S.Ct. at 1999. However, the Court did not go into any

22

detail about who would be an appropriate person, and current decisions of the Eleventh Circuit have not yet provided any guidance. In the only post-*Gebser* cases that address this issue, *Floyd v. Waiters, supra,* and *Davis v. DeKalb County School District,* 233 F.3d 1367 (11th Cir. 2000), the Eleventh Circuit does not directly address how a court determines who qualifies as a school board official and the elements necessary to reflect the existence of authority to address and correct discriminatory behavior. In *Floyd,* the Eleventh Circuit found, without discussion, that the only persons with knowledge of the discriminatory conduct were not school board officials *and* that they also lacked authority to end the pertinent discrimination. 171 F.3d at 1265 n.1. In *Davis,* the court found it unnecessary to decide if the principal of the elementary school where the discriminatory acts occurred was a supervisory official with authority to take corrective action on behalf of the school district. It merely held that, assuming *arguendo* that a principal could be such, there was no evidence to support the claim that he acted with deliberate indifference to notice of the misconduct of a teacher under his supervision. 233 F.3d at 1373.

Despite the lack of Eleventh Circuit guidance, it appears clear that a principal and an assistant principal may be officials of the school board for Title IX purposes. The Supreme Court, in *Davis v. Monroe County Board of Education,* 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999), reversed the dismissal of a Title IX lawsuit concerning student-on-student sexual harassment where the only "school official" with knowledge of the harassment was the school principal. *Id.* at 633-35, 119 S.Ct. at 1666-68. Likewise, the Court in *Gebser* referred to the principal as an "official" and determined that the information received was "insufficient

23

to alert the principal to the possibility that [the offending teacher] was involved in a sexual relationship with a student." 524 U.S. at 291, 118 S.Ct. at 2000. *See also Warren ex rel. Orlando v. Reading School Dist.*, 82 F.Supp.2d 395, 399 (E.D.Pa 2000) (finding that the *Gebser* court did not intend to exclude a school principal from those authorized people whose nonfeasance in the face of an allegation of misconduct can lead to school district liability).

The Supreme Court in *Davis v. Monroe County Board of Education* notes that where the misconduct occurs during school hours and on school grounds, the recipient of Title IX funds retains substantial control over the context in which the harassment occurs. It went on to state "[m]ore importantly, however, in this setting the Board exercises significant control over the harasser." 526 U.S. at 646, 119 S.Ct. at 1673. In view of the fact that the only "official" in *Davis* with knowledge of the harassment and, thus, the ability to "exercise control over the harasser," was the school principal, leads this court to the conclusion that a principal is an "official" for Title IX purposes.

The testimony reflects that the assistant principal's duties and powers were only occasionally subordinate to the principal. Though the principal could undoubtably overrule any decision made by the assistant principal, the assistant, nevertheless, had the authority to suspend and reassign students without first obtaining the permission of the principal. He also had the ability to investigate complaints of student and teacher misconduct and, in some instances, take action on his own while, in others, recommending to the principal that certain actions be taken. Under these circumstances, it is clear that the assistant principal was also an "official" of the Board for Title IX purposes.

24

The remaining question is whether either or both possessed the authority to address the alleged discrimination and institute corrective action. The corrective authority invested in both the principal and assistant principal of Warrior High School is limited to the ability to issue an oral or written reprimand to a teacher and/or to transfer a student out of an offending teacher's classroom. Any more severe punishment of a teacher may be recommended by the principal (but not by the assistant principal, who can only make a recommendation to the principal ) but can only be carried out with the approval of the superintendent and/or the Board itself. In other words, a principal may submit recommendations to the superintendent for the appointment, assignment, promotion, transfer and termination of personnel assigned to his or her supervision, but the principal cannot take these actions himself.

While the principal and assistant principal each had the power to limit Ramsey's contact with Gilliland by moving Gilliland out of Ramsey's classes, this, in and of itself, would be insufficient in view of the testimony that reflected allegedly harassing behavior occurring outside Ramsey's classroom, such as in the lunchroom and halls of the school and on an athletic practice field. However, if the limited powers of the principal of Warrior High School, as outlined above, allowed him to more fully "address the alleged discrimination and to institute corrective measures on the recipient's behalf," then Board liability is established. *Gebser,* 524 U.S. at 290, 118 S.Ct. at 1999.

In *Rosa H. v. San Elizario Independent School District*, 106 F.3d 648 (5th Cir. 1997), cited with approval by the Supreme Court in *Gebser,* 524 U.S. at 279, 118 S.Ct. at 1994, the Fifth Circuit addressed this issue, stating:

25

> We hold that a school district can be liable for teacher-student
> sexual harassment under Title IX only if a school official who had
> actual knowledge of the abuse was invested by the school board
> with the duty to supervise the employee and the power to take
> action that would end such abuse and failed to do so. This inquiry
> circumscribes those school employees in the chain of command
> whom the school board has appointed to monitor the conduct of
> other employees and, as distinguished from reporting to others,
> remedy the wrongdoing themselves. At the same time, it locates
> the acts of subordinates to the board at a point where the board's
> liability and practical control are sufficiently close to reflect its
> intentional discrimination. It does so by omitting the bulk of
> employees, such as fellow teachers, coaches, and janitors, unless
> the district has assigned them both the duty to supervise the
> employee who has sexually harassed a student and also the power
> to halt the abuse.

106 F.3d at 660. The court further stated:

> In order to qualify as a supervisory employee whose knowledge of
> abusive conduct counts as the district's knowledge, a school
> official must at least serve in a position with the authority to
> repudiate that conduct and eliminate the hostile environment on
> behalf of the school district.

*Id.* at 661(citation omitted) (internal quotation marks omitted). The argument can be made

based on this language in *Rosa H.*, that the principal's inability to take personnel action any

stronger than issuing a written or oral reprimand is insufficient to amount to authority to

"repudiate the conduct and eliminate the hostile environment." *See Baynard v. Lawson,* 112

F.Supp.2d 524, 532 (E.D.Va. 2000) (holding that because, in Virginia, a principal can only make

recommendations for the appointment, assignment, transfer, and dismissal of personnel

assigned to his supervision, a principal lacks the requisite authority to take corrective measures

for purposes of Title IX). However, the Supreme Court, while citing certain aspects of *Rosa H.*

with approval, has stated that the standard to be used is not whether the official can repudiate

26

the conduct and eliminate the hostile environment, but whether the official has the authority to "address the alleged discrimination and to institute corrective measures on the recipient's behalf." *Gebser*, 524 U.S. at 290, 118 S.Ct. at 1999.

Clearly, both Moon and Jett had the authority to address the alleged discrimination. Their purpose as principals is to oversee the faculty, staff and students at the school. Therefore, their duties include addressing any matter, including harassment, that impacts on the educational experience of the students.

The term "institute," by definition, means "to begin" or "initiate." Webster's II New Riverside University Dictionary (1986). Jett had the authority to institute certain corrective measures to address the discrimination, such as investigating reports of misconduct, issuing reprimands to an offending teacher, and transferring harassed students out of the offending teacher's classroom. He also had the ability to initiate more severe disciplinary proceedings, if warranted, by recommending that the Board take further disciplinary action. Though there is some authority to the contrary, *see Baynard v. Lawson, supra*, the undersigned believes that the powers invested in Jett as principal of Warrior High School are sufficient to allow him to address any alleged discrimination and to institute corrective measures on the Board's behalf, as those terms are used in *Gebser*. As a result, it is unnecessary to determine if Moon also is invested with such power. Given these facts and circumstances, the Court concludes that the motion of the defendant, Jefferson County Board of Education, for summary judgment as to Count I of the complaint is due to be denied.

27

### § 1983 Claim

In Count II of the complaint, it is alleged that plaintiff's rights under 42 U.S.C. § 1983 were violated by the Jefferson County Board of Education, and Jett, Moon and Ramsey, in their individual capacities. In order to state a claim for relief under § 1983, a plaintiff must allege that (1) the defendant's conduct caused the constitutional violation, and (2) the challenged conduct was "under color of state law." *Arnold v. Bd. of Educ. of Escambia County, Alabama*, 880 F.2d 305, 310 (11th Cir. 1989).

According to defendants, plaintiff's pleading is deficient because it is too vague. Rule 8 of the Federal Rules of Civil Procedure generally requires only a "short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." However, in an effort to eliminate non-meritorious claims on the pleadings and to protect public officials from protracted litigation involving specious claims, the Eleventh Circuit, as well as others, has held that a plaintiff must meet a "heightened pleading" standard to survive a motion to dismiss claims under § 1983 where there is a claim of individual liability subject to an absolute or qualified immunity defense. *Oladeinde v. City of Birmingham, Ala.*, 963 F.2d 1481, 1485 (11th Cir. 1992) (citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166-67, 113 S.Ct. 1160, 1162, 122 L.Ed.2d 517 (1993)), *cert. denied sub nom Deutcsh v. Oladeinde*, 507 U.S. 987, 113 S.Ct. 1586, 123 L.Ed.2d 153 (1993).

With regard to those defendants for whom the defense of qualified or absolute immunity may be raised, the heightened pleading standard requires "no more than that the plaintiff tell

28

his story, relating the pertinent information that is already in his possession." *Hunter v. District of Columbia*, 943 F.2d 69, 76 (D.C.Cir. 1991), citing *Siegert v. Gilley,* 500 U.S. 226, 244-46, 111 S.Ct. 1789, 1800-01, 114 L.Ed.2d 277 (1991) (Marshall, J., dissenting).  The Court notes that plaintiff has alleged that she was sexually harassed by Ramsey for a period of several years, that she eventually complained about the harassment to a school counselor, Jett, and Moon, and that nothing was done about it for at least several months thereafter, during which time the harassment continued. She asserts that she attempted to be removed from Ramsey's classes and that she received failing grades as a direct result of having complained about the harassment.[1] She further alleges that the school principal and assistant principal both were given notice of Ramsey's improper sexually-related behavior.

Plaintiff has asserted that the sexual harassment complained of created a hostile environment that affected her grades, curtailed her ability to learn and benefit from her high school education, and created a hostile, stressful, and unproductive educational environment which deprived her of her rights granted by the Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983. Plaintiff states that, under these facts, she does not allege a substantive due process claim but, rather, violations of her right to equal protection. In this case, the plaintiff has alleged and provided evidence which, if believed, amounts to sufficient evidence of sexually discriminatory conduct which was sufficiently severe or pervasive

---

[1] Defendants' assertion that plaintiff was failed for failing to attend a sufficient number of classes is incorrect.  Though she probably could have been given failing grades for her failure to attend Ramsey's classes had Ramsey followed proper procedure and required attendance, plaintiff testified that failure to attend Ramsey's classes was widespread among students, and only she was punished with a failing grade and only after she began to object to his harassment.

to alter the conditions of her education. In addition, there is evidence that Jett and Moon knew or should have known of the harassment and failed to take proper remedial action. This establishes a viable claim under § 1983 for violations of her right to equal protection. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

Defendants also assert that plaintiff's § 1983 action is duplicative of her Title IX action and, therefore, due to be dismissed. Neither the Eleventh Circuit nor the Supreme Court of the United States has been called upon to decide this issue. While § 1983 allows a cause of action based upon the violation of a federal statute, a statute's enforcement mechanisms may be "sufficiently comprehensive . . . to demonstrate congressional intent to preclude the remedy of suit under § 1983." *Lakoski v. James*, 66 F.3d 751, 754 (5th Cir. 1995) (citations omitted). Therefore, "to determine whether Congress intended to foreclose the § 1983 remedy for rights created by a federal statute, courts look to the remedial measures provided by the statute itself." *Id.*

In *Lakoski*, the Fifth Circuit held that Title IX does not create an avenue separate from Title VII for asserting employment discrimination claims against a state university because Title VII provided a comprehensive remedial scheme to vindicate plaintiff's rights allegedly violated by the school. The court reasoned that, in enacting Title IX, Congress did not intend for Title IX "to provide a bypass to Title VII's administrative procedures." *Id.* at 758.

However, the reasoning of *Lakoski* does not extend to the facts of this case. Here the plaintiff has no remedy under Title VII because she is a student, not a school employee, and Title VII only provides a remedy for discrimination in employment. Nevertheless, Title IX

30

provides plaintiff with a full redress of her grievances against the Board of Education such that a claim under § 1983 based on a violation of Title IX would be duplicitous and unnecessary, as no additional remedies would be available. *See Does v. Covington County School Board of Education*, 930 F.Supp. 554, 573-74 (M.D.Ala. 1996). Hence, the Court finds that plaintiff's claim against the Board under § 1983, to the extent that it is based on the Board's alleged violation of Title IX, is due to be dismissed with prejudice.

However, plaintiff also alleges that she has been deprived of her constitutional right to equal protection, separate and apart from any violation of Title IX. The court finds that Title IX does not preempt § 1983 actions based upon pre-existing constitutional rights, finding most persuasive the reasoning adopted by the Sixth, Eighth and Tenth Circuits. *See Crawford v. Davis*, 109 F.3d 1281, 1284 (8th Cir. 1997); *Seamons v. Snow*, 84 F.3d 1226,1233-34 & n.8 (10th Cir. 1996); *Lillard v. Shelby County Board of Education*, 76 F.3d 716, 722-24 (6th Cir. 1996). These courts reasoned that Title IX does not provide a sufficiently comprehensive remedial scheme for the vindication of constitutional rights because the only enforcement mechanism that Title IX expressly provides is a procedure to terminate federal support to institutions that violate Title IX. *See* 20 U.S.C. § 1682. By seeking relief under § 1983 for the alleged constitutional violations, plaintiff seeks to enforce constitutional rights wholly independent and totally distinct from her rights against the school board under Title IX. *Lillard*, 76 F.3d at 723. *Contra, Bruneau ex rel. Schofield v. South Kortright Central School District*, 163 F.3d 749, 757-58 (2d Cir. 1998).

31

Nevertheless, § 1983 does not impose *respondeat superior* liability on a governmental entity unless action pursuant to official policy of some nature caused a constitutional tort. *Monell v. Dept. of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). The undersigned magistrate judge finds, as a matter of law, that no liability attaches under § 1983 to the Jefferson County Board of Education. The Supreme Court has held that, unlike various government officials, municipalities do not enjoy immunity from suit, either qualified or absolute, under § 1983. Because a municipality can be sued under § 1983, but cannot be held liable unless a municipal policy or custom caused the injury, the heightened pleading required in cases to which an immunity defense might apply is inapplicable to the municipality. *Leatherman*, 507 U.S. at 166, 113 S.Ct. at 1162-63. Nevertheless, to impose liability on the school board as a unit of local government, the plaintiff must allege that the challenged conduct executed the official policy or custom of the school board. *Arnold*, 880 F.2d at 315. A claim of *respondeat superior* is insufficient to impose liability on the school board. *Id.* at 310. Board liability will only attach if Mitchell possesses *final* authority to establish Board policy with respect to the action ordered. *See id.* at 316, quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed. 2d 452 (1986).

There is no allegation that the Board had direct knowledge of Ramsey's, Jett's, or Moon's alleged violation of plaintiff's constitutional rights. Plaintiff has failed to point to any evidence which reflects that Mitchell was a final decision-maker. Therefore, any knowledge by Mitchell of allegedly discriminatory behavior by Ramsey, Jett, or Moon and his failure to act in the face of such knowledge cannot be construed as the policy or custom of the Jefferson County Board

32

of Education. While plaintiff contends that both Mitchell and Jett are officials whose acts can constitute "official policy or custom," this is simply not so. To be an official whose actions are considered to be the policy or custom of the Board, that official must have final policy-making authority. Because Mitchell did not have final policy-making authority, the claim against the Board is insufficient as a matter of law, and the Board has no liability under § 1983. Plaintiff alleges that the Board of Education had vested in Jett and Mitchell certain authority and responsibility for the operation, management, control, supervision, maintenance, regulation, and improvement of the Warrior High School. However, any actions on their parts regarding policy matters was subject to approval by members of the Board. Final policymaking authority over a particular subject area, such that actions of officials in that area may result in § 1983 liability of a branch of the local government, does not vest in an official whose decisions in the area are subject to meaningful administrative review. *Denno v. School Board of Volusia County, Florida*, 218 F.3d 1267, 1276 (11th Cir. 2000) (citations omitted).

The Jefferson County Board of Education had in place a sexual harassment policy that prohibited the sexual harassment of students by teachers. It also provided a procedure for making and investigating harassment complaints. The Board of Education may rightfully expect and assume that its employees will do their jobs as instructed. The fact that Jett or, possibly, Mitchell[2] may have failed to follow these policies and procedures does not mean their actions established Board policy or custom. It simply means they failed to do their jobs as assigned.

---

[2] As noted above, and contrary to the allegations of the plaintiff, there is no evidence that Mitchell was or should have been aware that Ramsey was involved in inappropriate conduct of a sexual nature with a student. See pp. 20-21, *supra*.

33

Plaintiff has, at most, demonstrated that Mitchell and Jett had some discretion in the performance of their jobs. However, "the mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority." *Mandel v. Doe*, 888 F.2d 783, 792 (11th Cir. 1989). The fact that the Board of Education did not continually investigate and review the decisions of Jett and Mitchell, regarding whether an incident should be reviewed for possible sexual harassment, does not alter this conclusion. "[T]he mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority . . . " *City of St. Louis v. Praprotnik,* 485 U.S. 112, 129, 108 S.Ct. 915, 928, 99 L.Ed.2d 107 (1988). There is no evidence that Mitchell and Jett were not "constrained by the official policies and [that their actions] were not subject to review." *Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997), quoting *Mandel*, 888 F.2d at 792.

The Supreme Court has stated that a municipality may be sued for deprivations "visited pursuant to governmental 'custom,' even though such a custom has not received formal approval through the body's official decision making channels." *Monell*, 436 U.S. at 690, 98 S.Ct. at 2036. To prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, "although not authorized by written law" or express municipal policy, is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.* at 691, 98 S.Ct. at 2036, quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167-68, 90 S.Ct. 1598, 1613, 26 L.Ed.2d 142 (1970). Put differently, "a longstanding and widespread practice is deemed authorized by the policymaking officials because they must have

34

known about it but failed to stop it." *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) Thus, plaintiff can succeed on her § 1983 claim if she can demonstrate that a custom existed, that the custom caused a deprivation of plaintiff's federal rights, and that the custom was so widespread that the Board of Education was aware of the custom and failed to end it. *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991). There is no evidence which reflects that the Board of Education was aware that its anti-harassment policy and procedures were not being followed by Jett or Mitchell. Thus, without the requisite knowledge on the part of the Board that Jett or Mitchell was acting contrary to Board policy, or evidence of negligence on the part of the Board in failing to discover this, these acts do not constitute the official policy or custom of the Jefferson County Board of Education. Since the court finds that there is no evidence that the alleged harassment was the result of an official policy of the Board, even under this theory of liability, the motion for summary judgment in favor of the defendant Board is due to be granted and Count II is due to be dismissed with prejudice as to the Jefferson County Board of Education on this basis, as well. However, a viable claim against Jett and Moon in their individual capacities remains for the alleged violation of plaintiff's right to equal protection.

### Qualified Immunity

Both Jett and Moon have asserted that they are entitled to qualified immunity. The Supreme Court formed the principle of qualified immunity in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982):

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.

*Id*. at 818, 102 S.Ct. at 2738 (citations and footnotes omitted). *Harlow* tightly constrains causes of action under § 1983. *Barts v. Joyner*, 865 F.2d 1187, 1189 (11th Cir. 1989). Government officials, in the exercise of their discretionary authority, are shielded from suit unless it is shown that they violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738. *See also Dartland v. Metropolitan Dade County*, 866 F.2d 1321, 1322 (11th Cir. 1989). When government officials are sued in their individual capacities, the application of qualified immunity to their actions is the rule rather than the exception, and "only in exceptional cases will government actors have no shield against claims made against them in their individual capacities." *Braddy v. Florida Dept. of Labor and Employment Security*, 133 F.3d 797, 801(11th Cir. 1998), quoting *Lassiter v. Alabama A & M Univ. Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994) (*en banc*).

There is a constitutional right under the Fourteenth Amendment to be free from sexual harassment. *Cross v. State of Alabama*, 49 F.3d 1490, 1507 (11th Cir. 1995), citing *Davis v. Passman*, 422 U.S. 228, 235, 99 S.Ct. 2264, 2272, 60 L.Ed.2d 846 (1979). The Court finds that this right is clearly established and may be the basis for a § 1983 action. *See, e.g., Davis v.*

*DeKalb County School District, supra; Doe ex rel. Doe v. Dallas Independent School District,* 220 F.3d 380 (5th Cir. 2000).

The Court must decide next if a reasonable person would have known that the actions of Jett or Moon violated Gilliland's right to be free of sexual harassment by a teacher. To accomplish this, Gilliland must also show that when Jett and Moon acted as they did, "the law was developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law." *Jones v. City of Dothan, Ala.*, 121 F.3d 1456, 1459 (11th Cir. 1997) (citations omitted).

It is well established that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates "on the basis of *respondeat superior* or vicarious liability." *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994) (citation and quotation omitted). However, it may be established another way.

> Supervisory liability [under § 1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences.

*Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990) (citations omitted). The causal connection between the constitutional deprivation and the actions of the supervising official may also be established and supervisory liability imposed where the supervisor's improper

flagrant, rampant nature, and of such continued duration that it was sufficient to put the supervising officials, Jett and Moon, on notice. Therefore, these facts and allegations outline a factual dispute which must be resolved before there can be a determination of whether Jett and Moon are entitled to qualified immunity.

In addition, when faced with information of improper conduct on the part of Ramsey consistently involving female students, the evidence submitted reflects that neither Jett nor Moon initiated or engaged in any investigation into his conduct other than taking a complaint from a parent, talking to Ramsey himself, and counseling him about being alone with female students. The sexual harassment policy of the Jefferson County Board of Education in effect at the time of these events required a supervisor receiving a complaint to begin an immediate investigation into the matter. It was required that the completed investigation be reviewed by the Superintendent or his designee and legal counsel for prompt and appropriate action. [Doc. #103, Exh. 16].

Despite this policy, no students ever were questioned about any of the incidents, including the incident of a student undressing in front of Ramsey. Likewise, no completed investigation of any of these incidents was ever presented by Jett or Moon to the Superintendent or his designee or to legal counsel. The Court concludes that, if believed, a jury reasonably could conclude that the consistent failure of Jett and Moon to take steps at any time to meaningfully and immediately investigate the numerous incidents of which they were aware established within Warrior High School a custom or policy of failing to investigate harassment complaints, as directed by Board policy, which resulted in deliberate indifference to Gilliland's

39

constitutional rights.  This custom thereby can establish a causal connection between the constitutional deprivation and the actions of the supervising official sufficient to result in liability for each under § 1983.  Though there is evidence that Ramsey was counseled about being alone with female students, there is also evidence, if believed, that Jett and Moon specifically were told that harassment was continuing and that a sexually hostile environment existed even after this counseling occurred.  Specifically, Angelia Gilliland and Sheila Gilliland claim they told Moon that Angelia was being harassed when they asked that she be removed from Ramsey's class.  In addition, during this same time period, Janice Long wrote a letter to Jett about incidents where students disrobed in front of Ramsey.  If this evidence is believed, there is no evidence that Jett or Moon acted to end such incidents.  Likewise, though there is evidence that the plaintiff was not offended initially by Ramsey's conduct, there is testimony that she eventually became offended by its constant and continuing nature.  Thus, as noted above, a factual dispute exists as to whether Jett and Moon are entitled to qualified immunity.  Therefore, the motion to dismiss Count II as to Jett and Moon is due to be denied.

Plaintiff alleges that Ramsey personally took part in harassing behavior and in fostering a sexually hostile environment.  Ramsey denies having done any of the acts alleged by the plaintiff, except for the incidents which are documented in his personnel file.  Therefore, there exists a factual dispute such that Ramsey's motion for summary judgment as to Count II is due to be denied.

40

**State Law Claims**

### Invasion of Privacy

Plaintiff has asserted a claim against Ramsey for invasion of privacy. In a suit for invasion of privacy, a plaintiff must show one of four acts occurred: (1) an intrusion into the plaintiff's physical solitude or seclusion; (2) publicity which violates the ordinary decencies; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; or (4) the appropriation of some element of the plaintiff's personality for a commercial use. *Phillips v. Smalley Maintenance Services, Inc.*, 435 So.2d 705, 708 (Ala. 1983). This case falls into the intrusion upon physical solitude or seclusion category. This category is further defined as "the wrongful intrusion into one's private activities in such manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *Logan v. Sears, Roebuck & Co.*, 466 So.2d 121, 124 (Ala. 1985).

Plaintiff alleges numerous acts wherein Ramsey harassed her through physical contact, comments of a sexual nature and inquiries into her sexual experiences. Such conduct could be found by a jury to be shameful and humiliating to a person of ordinary sensibilities. Although there is evidence that plaintiff did not initially find this conduct overly offensive, she has produced evidence which reflects that the continuous nature of Ramsey's actions eventually reached a point where it did offend her, causing her to complain about his conduct and request removal from his classes. Therefore, Ramsey's motion for summary judgment as to the claim of invasion of privacy, alleged in Count III is due to be denied.

41

### Assault and Battery

Plaintiff has asserted a claim of assault and battery against Ramsey. The court finds that there exists a substantial question of fact as to the claim for assault and battery. According to the Alabama Supreme Court, "an assault and battery is any touching by one person of the person of another in rudeness or in anger." *Whitlow v. Bruno's, Inc.*, 567 So.2d 1235, 1239 (Ala. 1990) (citations omitted). Plaintiff has alleged that Ramsey grabbed her bottom on several occasions, placed his hand on her upper thigh, placed her hand on his thigh and moved it toward his crotch, and massaged her shoulders and the top of her breasts. There is also testimony that she found these actions inappropriate and offensive. Ramsey denies that these acts occurred. However, this is for the jury to determine, as is whether the actions, if proven, would be rude or offensive to the reasonable person. Therefore, Ramsey's motion for summary judgment as to plaintiff's claim of assault and battery alleged in Count IV is due to be denied.

### Outrage

The Alabama Supreme Court recognized the tort of outrage in *American Road Service Co. v. Inmon*, 394 So.2d 361 (Ala. 1980). Under this theory, liability is imposed for "unprivileged, intentional or reckless conduct of an extreme and outrageous nature, and only that which causes severe emotional distress." *Id.* at 365. Egregious sexual harassment can amount to the tort of outrage. *Henry v. Georgia-Pacific Corp.*, 730 So.2d 119, 121 (Ala. 1998); *Busby v. Truswal Systems Corp.*, 551 So.2d 322, 324 (Ala. 1989). However, this harassment must amount to conduct that was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency." *Inmon*, 394 So.2d at 365.

42

Plaintiff alleges that Ramsey's conduct was continuous from the time she was fourteen years old until she was seventeen years old. Ramsey was a high school band teacher with a position of authority over plaintiff. As noted above, while there is evidence that plaintiff did not initially find this conduct overly offensive, she has produced evidence which reflects that the continuous nature of Ramsey's actions eventually reached a point where it did offend her, causing her to complain about his conduct and request removal from his class. She also has testified that, as a result of Ramsey's conduct, she has suffered depression and other emotional problems. Hence, the court concludes that it is for a jury to determine if the acts complained of occurred and, if so, whether Ramsey's conduct was so extreme that it would outrage a reasonable person and plaintiff. Therefore, as to Ramsey, the motion for summary judgment for the tort of outrage alleged in Count V is due to be denied.

Under Alabama law, county boards of education are local agencies of the state, charged by the legislature with supervising public education within the counties. As such, they partake of the state's immunity from lawsuits to the extent the legislature authorizes. *C.B. v. Bobo*, 659 So.2d 98, 101 (Ala. 1995). Actions against employees of boards of education, including school principals, are also generally barred. *Id.* In *Bobo,* a teacher sexually molested several students. The complaint charged that the principal and others knew of the teacher's propensities and had received complaints about his actions, but had taken no action to stop the abuse and to protect the plaintiffs from his acts. However, the complaint did not allege any fraud or bad faith. *Id.* The Alabama Supreme Court upheld the trial court's dismissal of the claim based on discretionary immunity, finding that "[w]hatever that action might have been,

43

it related to the performance of the defendants' statutory duties, which were discretionary functions for which they possessed constitutional immunity." *Id.*, citing *Hill v. Allen*, 495 So.2d 32 (Ala. 1986).

The acts of defendants Jett and Moon, as alleged by the plaintiff, may amount to wanton negligence, but there is no evidence that they acted fraudulently or in bad faith. Therefore, the court finds that Jett and Moon are entitled to discretionary function immunity for this claim.[3] The motion for summary judgment for the tort of outrage alleged in Count V, as to defendants Jett and Moon, is due to be granted.

### Negligent Retention

Though plaintiff has made a claim for negligent retention, naming the individual board members acting in their official capacities as defendants, she has not responded to the defendants' motion for summary judgment regarding this matter. There is no evidence that any member of the board had any knowledge of the alleged acts of Ramsey. Likewise, there is no evidence that they acted with regard to this matter in any manner that could be construed as fraudulent, in bad faith, beyond their authority, or in a mistaken interpretation of the law. *See Williams v. Hank's Ambulance Service*, 699 So.2d 1230, 1232 (Ala. 1997). Thus, the court concludes that there is no evidence of negligent retention by the named defendants and, in any case, they are entitled to discretionary function immunity. *Hutt v. Etowah County Board of*

---

[3] State law tort claims are based on violations of duties of care owed by one party to another, while § 1983 imposes liability for violations of rights protected by the Constitution. *Baker v. McCollan*, 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979). Thus, a claim of qualified immunity may not be available to a party under § 1983, even though discretionary function immunity protects the party from liability for state law torts based on the same conduct. *See generally, C.B. v. Bobo*, 659 So.2d 98 (Ala. 1995).

*Education*, 454 So.2d 973,974 (Ala. 1984).   Therefore, defendants' motion for summary judgment as to the negligent retention claims against the individual board members acting in their official capacities, as alleged in Count VI, is due to be granted.

A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this __21st__ day of February, 2001.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE

45